IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

ERICA M. EDMOND,

            Plaintiff,                    No. CIV S-07-1660 EFB

       vs.

MICHAEL J. ASTRUE,
Commissioner of Social Security,

            Defendant.                <u>ORDER</u>

_____/

      Plaintiff seeks judicial review of a final decision of the Commissioner of Social Security ("Commissioner") that plaintiff no longer meets the requirements for receiving Supplemental Security Income ("SSI") under XVI of the Social Security Act ("Act"). For the reasons discussed below, the court denies plaintiff's motion for summary judgment, and grants the Commissioner's cross-motion for summary judgment.

I. <u>BACKGROUND</u>

      Plaintiff, born December 24, 1984, received SSI commencing April 1992, based on a childhood disability. Administrative Record ("AR") 28, 18. As required by the Social Security Act, plaintiff's eligibility was reevaluated when she reached age 18, under the rules applicable to adults who submit new disability applications. 42 U.S.C. § 1614(a)(3)(H). Upon review of plaintiff's medical and educational records, and the report of a consultative psychologist, the

1

Commissioner determined, on April 10, 2003, that plaintiff was no longer disabled within the meaning of the Act. AR 47-50 (Disability Redetermination Decision). Plaintiff sought reconsideration, AR 52-57, and after a hearing before a Disability Hearing Officer on January 20, 2004, the Commissioner again concluded, on February 11, 2004, that plaintiff is no longer disabled. AR 62-70.

Plaintiff sought a hearing before an administrative law judge. AR 71-77. At the May 15, 2006 hearing,[1] plaintiff testified that she was 21 years of age, and completed the tenth grade. AR 298. She has not obtained a GED, taken any college courses, or had any vocational or on-the-job training. AR 298-299. Plaintiff speaks English, and answered "no" to the question, "Can you read and write in the English language?" AR 299.

Plaintiff testified that she has been working part time since 2003, providing "in home care" for her uncle one hour a day, five days a week. She was paid by In-Support Services at the biweekly rate of $113, but doesn't get paid any longer. AR 299-301, 306, 307, 317. Plaintiff stated that this is the only job she's had. Her duties include folding clothes, making beds, and washing dishes; she doesn't cook or give medication. AR 300. She walks to her uncle's house, which is two blocks away. AR 307. She also provides similar care for a friend of her grandmother, but doesn't get paid. AR 309, 318-323. *See also* AR 331-335.[2]

////

---

[1] The hearing was initially convened on January 11, 2006, before administrative law judge ("ALJ") James Mitchell, AR 282-294, but recovened May 15, 2006, AR 295-336; *see also* AR 221-228 (ALJ's dismissal of hearing request based on counsel's failure to show good cause for missing initial hearing, and remand by Appeals Council to ALJ to provide claimant a hearing).

[2] Despite significant discussion at the administrative hearing whether plaintiff's employment constituted substantial gainful activity ("SGA"), the ALJ correctly concluded that "this step is not used for redetermining disability at age 18 (20 CFR § 416.987(b))." AR 19. The ALJ noted, however, "that the claimant has worked as an in-home care provider since 2003 (Exhibit 35). Her duties include cleaning the kitchen, living room and bedrooms, making beds, and washing dishes (Exhibits 42; 43, page 3). The claimant's monthly gross earnings in 2005 were $658.74 and $753.23 in 2006 (Exhibit 44)." *Id.*

2

Plaintiff testified that she has two children, ages 6 and 1; plaintiff and her children live with plaintiff's grandmother. AR 301, 304, 311. Plaintiff testified that she cares for her own children, that she prepares meals twice a day, washes dishes once a day, mops floors twice a week, sweeps or vacuums twice a week, makes beds and changes sheets three times a week; that she watches TV an hour a day, and otherwise plays with her children, AR 309, 304-306. Plaintiff testified that she does not do laundry, dust, clean the bathroom, or do any yard work. AR 305, 307, 323-324.

Plaintiff testified that on a regular day she gets up at 7 a.m. and goes to bed at 8 p.m. AR 303. She stated that she sleeps an average of five hours. AR 309. In the morning, she gets cereal for her daughter, and eats with her; then her grandmother takes her daughter to school. AR 325. Plaintiff goes to her uncle's at 8 a.m., and then to her grandmother's friend, while her grandmother cares for plaintiff's youngest child. AR 325-326. Plaintiff gets home around 11 a.m. or noon. AR 326.

Plaintiff testified that she has a driver's license, but does not drive. AR 308. She took the "written" test by "headset" and took the exam 11 times before she passed. AR 316. Plaintiff testified that she doesn't have a checking account or pay any bills. AR 306.

Plaintiff testified that she has no physical problems, and does not take any medication. AR 309, 312-315. She stated that she has a regular physician, Dr. Tanson, and saw him four times in the last year. AR 310. Plaintiff stated that she is 5'2" tall and weighs 175 pounds. AR 315.

Vocational expert Susan Moranda testified at the hearing. Ms. Moranda testified that work of a home health aid is generally performed at the medium exertion level, and at the lower end of semiskilled, "close to unskilled" level AR 327. The ALJ posed several hypothetical questions to the vocational expert. AR 327-331.

////

////

3

The ALJ issued a decision on January 18, 2007, finding that plaintiff is not disabled.[3]

AR 18-27. The ALJ made the following findings:

1. The claimant attained age 18 on December 23, 2002 and was eligible for supplemental security income benefits as a child for the month preceding the month in which she attained age 18. The claimant was notified that she was found no longer disabled as of April 1, 2003, based on a redetermination of disability under the rules for adults who file new applications.

2. As of April 1, 2003, the claimant has had the following severe impairments: borderline intellectual functioning; a learning disorder and obesity (20 CFR 416.920(c)).

3. As of April 1, 2003, the claimant has not had an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926).

---

[3] Disability Insurance Benefits are paid to disabled persons who have contributed to the Social Security program, 42 U.S.C. §§ 401 *et seq.* Supplemental Security Income ("SSI") is paid to disabled persons with low income. 42 U.S.C. §§ 1382 *et seq.* Under both provisions, disability is defined, in part, as an "inability to engage in any substantial gainful activity" due to "a medically determinable physical or mental impairment." 42 U.S.C. §§ 423(d)(1)(a) & 1382c(a)(3)(A). A five-step sequential evaluation governs eligibility for benefits. *See* 20 C.F.R. §§ 423(d)(1)(a), 416.920 & 416.971-76; *Bowen v. Yuckert,* 482 U.S. 137, 140-42 (1987). The following summarizes the sequential evaluation:

Step one: Is the claimant engaging in substantial gainful activity? If so, the claimant is found not disabled. If not, proceed to step two.

Step two: Does the claimant have a "severe" impairment? If so, proceed to step three. If not, then a finding of not disabled is appropriate.

Step three: Does the claimant's impairment or combination of impairments meet or equal an impairment listed in 20 C.F.R., Pt. 404, Subpt. P, App.1? If so, the claimant is automatically determined disabled. If not, proceed to step four.

Step four: Is the claimant capable of performing his past work? If so, the claimant is not disabled. If not, proceed to step five.

Step five: Does the claimant have the residual functional capacity to perform any other work? If so, the claimant is not disabled. If not, the claimant is disabled.

*Lester v. Chater,* 81 F.3d 821, 828, n. 5 (9th Cir. 1995).

The claimant bears the burden of proof in the first four steps of the sequential evaluation process. *Bowen*, 482 U.S. at 146, n. 5. The Commissioner bears the burden if the sequential evaluation process proceeds to step five. *Id.*

4

4.  After careful consideration of the entire record, the undersigned finds that, as of April 1, 2003, the claimant has had the residual functional capacity to perform work at a light exertional level.  She has a slight limitation in the ability to pay attention, concentrate, understand and remember.  Her ability to perform fine and gross manipulation is unlimited.  She has a slight limitation in the ability to perform simple, routine, repetitive tasks, and can have unlimited contact with the public.  She requires only occasional supervision while having slight pain.[4]  She is unable to read or write.

5.  As of April 1, 2003, the claimant has been unable to perform any past relevant work (20 CFR 416.965).[5]

6.  The claimant is a younger individual, on the date the application was filed (20 CFR 416.963).

7.  The claimant has a limited education and is able to communicate in English (20 CFR 416.964).

8.  Transferability of job skills is not an issue in this case because the claimant's past relevant work is unskilled (20 CFR 416.968).

9.  As of April 1, 2003, considering the claimant's age, education, work experience, and residual functional capacity, the claimant was able to perform a significant number of jobs in the national economy (20 CFR 416.960(c) and 416.966).

10.  The claimant was no longer disabled as of April 1, 2003, through the date of this decision (20 CFR 416.987(e) and 416.920(g)).

*Id.*

On June 12, 2007, the Appeals Council denied plaintiff's request for review, and the

ALJ's decision became the final decision of the Commissioner.  AR 4-6.

II.  ISSUES PRESENTED

Plaintiff contends that: (1) substantial evidence does not support the ALJ's finding that

plaintiff has only slight, rather than moderate, limitations of concentration, persistence and pace;

_____

[4]  This reference to pain appears to be in error; plaintiff testified that she has no physical impairments, and the record does not reveal any allegations of pain.

[5]  This finding apparently is due as much to the absence of any meaningful past relevant work than to the nature of plaintiff's combined functional limitations.  The ALJ discusses the exertional limitations in this regard, but not the mental functioning limitations.  However, as noted, plaintiff's past "work" consisted of what appears to be a sheltered work setting where she worked one hour per day folding clothes, making beds and washing dishes for her uncle.

(2) the ALJ erred in finding that plaintiff's mental impairment does not meet or equal the criteria for Listing 12.05C (Mental Retardation); and (3) the ALJ improperly rejected the opinion of plaintiff's consultative psychiatrist, Dr. Les Kalman.

III. LEGAL STANDARDS

The Commissioner's decision that a claimant is not disabled will be upheld if the findings of fact are supported by substantial evidence in the record and the proper legal standards were applied. *Schneider v. Comm'r of the Soc. Sec. Admin.*, 223 F.3d 968, 973 (9th Cir. 2000); *Morgan v. Comm'r of the Soc. Sec. Admin.*, 169 F.3d 595, 599 (9th Cir. 1999); *Tackett v. Apfel*, 180 F.3d 1094, 1097 (9th Cir. 1999).

The findings of the Commissioner as to any fact, if supported by substantial evidence, are conclusive. *See Miller v. Heckler*, 770 F.2d 845, 847 (9th Cir. 1985). Substantial evidence is more than a mere scintilla, but less than a preponderance. *Saelee v. Chater*, 94 F.3d 520, 521 (9th Cir. 1996). "'It means such evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938)).

"The ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and resolving ambiguities." *Edlund v. Massanari*, 253 F.3d 1152, 1156 (9th Cir. 2001) (citations omitted). "Where the evidence is susceptible to more than one rational interpretation, one of which supports the ALJ's decision, the ALJ's conclusion must be upheld." *Thomas v. Barnhart*, 278 F.3d 947, 954 (9th Cir. 2002).

IV. EVIDENCE

A. ASSESSMENTS PRIOR TO AGE 18

In September 1998, when plaintiff was age 13 years, 8 months, and in the eighth grade, she was evaluated by school psychologist Kimberly J. Robinson, M.S. AR 142-144. Ms. Robinson noted that plaintiff, while in second grade, was placed in the resource specialist program for support in reading and writing. As a fifth grader, plaintiff transitioned into a special

day class. From fourth to sixth grade, plaintiff received speech and language services. AR 142. Plaintiff scored within only the first and seventh percentiles on tests of visual, auditory and memory functioning. AR 143. Academically, she tested at the second grade level in reading and writing, and the fifth grade level in mathematics. Ms. Robinson opined that plaintiff's "overall estimated functioning ranged between the Borderline and Low Average Range of development," but that she "does not meet ongoing eligibility criteria for special education services," yet should "continue receiving support in the area of language arts to build her skills as she begins to transition back into the regular program on a full time basis." AR 144. Plaintiff nonetheless remained in special educational services. AR 139, 140.

On October 1, 2001, when plaintiff was age 16 years, 9 months, and in the tenth grade, she was evaluated by educational psychologist Jeri Alvarez, Ed.D., as part of a triennial assessment of continuing need for special education services. AR 139-141. Dr. Alvarez noted that plaintiff's initial referral in second grade was based on "[h]er primary handicapping condition [] identified as Specific Learning Disability with processing deficits identified in auditory processing, aural memory, and auditory conceptualization deficits." AR 139. Based upon the results of several tests, Dr. Alvarez summarized her findings as follows:

> Nonverbal problem solving skills were in the well below average to low average range. Memory skills were in the deficient to well below average range. Auditory thinking and reasoning skills (acquired knowledge and comprehension) were in the deficient range.
>
> Results suggested severe deficits in phonological skills. Significant unsatisfactory performance of reading skills relative to Erica's relative learning strengths was evidenced.

AR 141.

Dr. Alvarez recommended that plaintiff continue receiving special education services, and provided several specific recommendations to help plaintiff improve her reading skills. *Id.*

////

////

B.  CURRENT ASSESSMENTS

All current testing was conducted by consultative examiners; there are no applicable treating records.

1.  PSYCHOLOGISTS MATTESICH AND WAKEFIELD

On April 1, 2003, at the request of the Commissioner, plaintiff was evaluated by both Robert L. Mattesich, Licensed Educational Psychologist, and psychologist James A. Wakefield, Jr., Ph.D.  AR 152-162.

The Mattesich-Wakefield report summarizes plaintiff's daily activities as follows:

> Erica stated that she lives in a home with her grandmother, sister, cousin and three years of age daughter.  Her daily activities include taking the bus to and from school.  She noted that she gets out of school at noon.  Erica stated that she is the primary care provider for her daughter.  Other daily activities include cooking, housecleaning and reading stories to her daughter.

AR 153.  The report noted that plaintiff "telephoned this examiner for directions to this office. She took the directions over the telephone and was able to direct her grandmother who drove." *Id.*

Administration of the Wechsler Adult Intelligence Scale, Third Edition ("WAIS-III") provided the following overall results:  Verbal IQ of 73, Performance IQ of 65, and Full-scale IQ of 67.  AR 155.  While the examiners perceived that plaintiff "put forth her best effort," they opined that these results underestimated plaintiff's cognitive functioning.  AR 154, 156.  Plaintiff completed "Trails A" in the 25th percentile; "Trails B" was "terminated as she became confused and out of sequence." *Id.*  Plaintiff's score of 69 on the General Memory Index "fell more than two standard deviations below the mean, and indicated the presence of significant deficits in her measured ability to utilize memory."  AR 156.

////
////
////
////

The examiners made the following diagnoses pursuant to the American Psychiatric

Association's multiaxial framework:[6]

| | | |
|---|---|---|
| Axis I: | Learning Disorder | |
| Axis II: | Borderline Intellectual Functioning | |
| Axis III: | By report, no significant medical issue | |
| Axis IV: | Psychosocial stressors are mild | |
| Axis V: | GAF 75[7] | |

AR 143.

The examiners noted that, during testing, plaintiff "exhibited an adequate degree of task

persistency, and was able to maintain her concentration." AR 154. The examiners summarized

their findings in pertinent part:

> Results from current standardized testing suggested the presence of borderline
> intellectual functioning (based upon verbal IQ score). Test results further
> suggested the presence of a specific learning disorder associated with deficits in
> visual sensory processing. She is able to understand, carry out and remember
> simple instructions. Erica possess the necessary skills to respond appropriately to
> co-workers, supervisors and the public. She would be capable of responding
> appropriately to usual work situations involving such things as attendance and
> safety. She is able to deal with changes in a routine work setting. She does not
> present with limitations due to emotional impairment.

AR 157.

---

[6] The American Psychiatric Association's Multiaxial Assessment is set forth in the
Diagnostic and Statistical Manual of Psychiatric Disorders, ("DSM-IV") (4th ed. 1994), at pp.
25-33:

| | | |
|---|---|---|
| Axis I: | Clinical Disorders | |
| | Other Conditions That May Be a Focus of | |
| | Clinical Attention | |
| Axis II: | Personality Disorders | |
| | Mental Retardation | |
| Axis III: | Medical Conditions | |
| Axis IV: | Psychosocial and Environmental Problems | |
| Axis V: | Global Assessment of Functioning ("GAF"). | |

The GAF Scale "[c]onsider[s] psychological, social, and occupational functioning on a
hypothetical continuum of mental health-illness." *Id.* at p. 34.

[7] A GAF 71 to 80 denotes the following: "If symptoms are present, they are transient and
expectable reactions to psychosocial stressors (e.g., difficulty concentrating after family
argument); no more than slight impairment in social, occupational, or school functioning (e.g.,
temporarily falling behind in schoolwork)." DSM-IV, at p. 34.

The examiners opined that plaintiff was not capable of handling funds. AR 157, 158.

## 2. PSYCHIATRIST BRADLEY DAIGLE

On September 7, 2003, at the request of the Commissioner, plaintiff was evaluated by psychiatrist Bradley Daigle, M.D. AR 184-189. Dr. Daigle interviewed plaintiff, reviewed the Mattesich-Wakefield's report and "two pages of social security notes," AR 184, but did not administer any tests. Dr. Daigle noted that plaintiff left school "in the 11th grade and is currently in the process of enrolling for her GED classes." AR 186. He noted that plaintiff "has limited household activities and her grandmother does the cooking, laundry and chores. Erica handles her own self-care as well as bathing and dressing the baby. She does not handle her own bills and money. She goes to church at times. She spends time with her child and watches television." *Id.*

Dr. Daigle made the following assessment pursuant to the American Psychiatric Association's multiaxial framework:

| | |
|---|---|
| Axis I: | Learning Disability, by history |
| Axis II: | History of borderline intellectual functioning |
| Axis III: | No diagnosis |
| Axis IV: | Psychosocial stressors: Code 2 – Minimal |
| Axis V: | GAF 70[8] |

AR 188.

Dr. Daigle made the following functional assessment:

1. Slightly limited in ability to understand, remember, and carry out *simple* 1 or 2-step job instructions.

2. Moderately limited in ability to follow detailed and complex instructions.

3. Slightly limited in ability to relate and interact with supervisors, co-workers and the public.

4. Slightly limited in ability to maintain concentration and attention, persistence

---

[8] A GAF 61 to 70 denotes "Some mild symptoms (e.g., depressed mood and mild insomnia) or some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships." DSM-IV, at p. 34.

and pace.

5. Slightly to moderately limited in ability to associate with day-to-day work activity, including attendance and safety.

6. Slightly limited in ability to adapt to the stresses common to a normal work environment.

AR 188-189 (emphasis in original).

Dr. Daigle opined that plaintiff was not capable of handling her own funds. AR 189.

### 3. PSYCHIATRIST LES KALMAN

On April 11, 2006, at the request of plaintiff's counsel, plaintiff was evaluated by psychiatrist Les. P. Kalman, M.D., Psy.D, M.F.C.C., DABFM.[9] AR 259-266. Dr. Kalman noted that plaintiff "arrived on time, came alone, [and] rode the bus to the office." AR 259. Dr. Kalman conducted a mental status examination, without objective testing, and reviewed, *inter alia*, the Mattesich-Wakefield report, Dr. Daigle's report, the evaluations of the state agency physicians, and plaintiff's school records. AR 262. Dr. Kalman noted, with respect to daily activities, that plaintiff "doesn't do her own shopping, cooking, housekeeping. Her grandmother does. She can manage her own transportation. She states, 'my grandmother tells me which bus to get on.' She does care for her own personal hygiene. She doesn't pay her own bills." AR 261. Dr. Kalman stated that plaintiff doesn't have any friends, and on a typical day, "work, come home, care for kids." *Id.*

Dr. Kalman made the following assessment pursuant to the American Psychiatric Association's multiaxial framework:

| | |
|---|---|
| Axis I: | Learning disorder, reading, mathematics and written expression |
| Axis II: | Mild mental retardation |
| Axis III: | None |
| Axis IV: | Illiterate |

---

[9] The court construes these degrees to represent medical doctor; doctorate in psychology; marriage, family, and child counselor; and board certified in forensic medicine.

Axis V:      GAF of 50[10]

AR 261.

Dr. Kalman completed a "Medical Source Statement Concerning the Nature and Severity of an Individual's Mental Impairment." AR 263-266. He found in pertinent part that plaintiff is "mildly limited" in her "ability to understand and remember very short and simple (one- or two-step) repetitive instructions or tasks," the "ability to maintain attention and concentration for extended periods (the approximately 2-hour segments between arrival and first break, lunch, second break, and departure) with four such periods in a workday," and the "ability to perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances." AT 263, 264. Dr. Kalman found "moderate limitations" in plaintiff's abilities to "remember locations and work-like procedures," "sustain an ordinary routine without special supervision," "work in coordination with or proximity to others without being unduly distracted by them," "make simple work-related decisions," and "complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods." *Id.*

Dr. Kalman opined that plaintiff was not able to manage her own funds. AR 261.

### 4. INTERNIST JANET O'BRIEN

On August 28, 2003, at the request of the Commissioner, plaintiff was evaluated by internist Janet O'Brien, M.D. AR 179-183. Dr. O'Brien described plaintiff as moderately obese, found that she has no exertional limitations, and opined that plaintiff could perform heavy work (lift 50 pounds frequently, and 100 pounds occasionally). State Agency physician George A. Jansen, Sr., M.D., reviewed the records and reached the same conclusion, though he noted that plaintiff has a history of asthma. AR 214.

---

[10] A GAF 50 (41 to 50) denotes "Serious symptoms (e.g., suicidal ideation, severe obsessional rituals, occasional panic attacks) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." DSM-IV, at p. 34.

1    C. <u>STATE AGENCY REVIEWS</u>

2        1. <u>GERTRUDIS AGCAOILI, M.D.</u>

3        On April 9, 2003, Gertrudis Agcaoili, M.D., reviewed the record and completed both a

4    Psychiatric Review Technique Form ("PRTF") and a Mental Residual Functional Capacity

5    Assessment ("MRFC"). AR 159-178.

6        Pursuant to the PRTF, Dr. Agcaoili evaluated whether plaintiff met the criteria for Listed

7    Impairment 12.02 (organic mental disorders), based on plaintiff's mental impairment, and Listed

8    Impairment 12.05 (mental retardation), based on plaintiff's borderline IQ, and opined that she

9    met neither but needed to be evaluated for residual functional capacity. AR 165, 166, 169. With

10   respect to the "B" criteria for assessing the severity of a mental impairment, 20 C.F.R.

11   §416.920a,[11] Dr. Agcaoili found that plaintiff has 'mild" restriction of activities of daily living;

12   "mild" difficulties in maintaining social functioning; "moderate" difficulties in maintaining

13   concentration, persistence, or pace; and that there was "insufficient evidence" to assess whether

14   she has had extended episodes of decompensation. AR 175. Dr. Agcaoili opined that plaintiff

15   was capable of performing simple repetitive tasks ("SRT"). AR 177.

16       Pursuant to the MRFC, Dr. Agcaoili found that plaintiff was "not significantly limited" in

17   any mental work-related activity with the exception of "ability to carry out detailed instructions,"

18   _____

19   [11]  The procedure for assessing the severity of a claimant's alleged mental impairments is
      set forth in set forth in 20 C.F.R. §416.920a. This regulations requires that the administrative
20    law judge rate the degree of functional limitation resulting from a medically determinable mental
      impairment(s) in accordance with the following four functional areas (the "'B' criteria"):
21    Activities of daily living; Social functioning; Concentration, persistence, or pace; and Episodes
      of decompensation. A five-point scale is used to rate the degree of limitation in the first three
22    functional areas ("None, mild, moderate, marked, and extreme"). A four-point scale is used to
      rate the degree of limitation in the fourth functional area ("None, one or two, three, four or
23    more"). If the degree of limitation in the first three functional areas is "none" or "mild," and is
      "none" in the fourth functional area, it is generally appropriate to conclude that a claimant's
24    mental impairment is not severe. 20 C.F.R. §416.920a (b),(c),(d).
          A Psychiatric Review Technique Form (PRTF) demonstrating consideration of all the
25    above factors must be completed at the initial and reconsideration levels of the administrative
      review process, but application of the technique need only be documented in the narrative
26    decisions of the administrative law judge and Appeals Council. 20 C.F.R. § and 416.920a(e).

which Dr. Agcaoili found "moderately limited."  AR 159-160.

Dr. Agcaoili provided the following summary of her residual functional assessment:

The claimant is an 18 year old female with a 10th grade education.  History of special education classes but school psychologist found claimant no longer met criteria for this program and was slotted to return to regular classes on a full time basis.  She is currently attending alternative school.  She is able to care for her 3 yr old daughter.  She is able to take the bus to school and back, cook, do housecleaning and read stories to her daughter.

PhD CE examiner found claimant cooperative but felt results of test appeared to be under-estimation of her cognitive functioni[g].  It was noted the claimant was no[t] malingering.  She was able to exhibit adequate degree of task persistency, maintain concentration.

MEOR appears to be consistent with no conflicts.  Clmt is capable of performing simple, repetitive tasks based on current cognitive testing and school records.

AR 161.

## 2. CHARLOTTE BIBLE, M.D.

On September 29, 2003, Charlotte Bible, M.D., reviewed the record and also completed both a Psychiatric Review Technique Form ("PRTF") and a Mental Residual Functional Capacity Assessment ("MRFC").  AR 191- 211.

Pursuant to the PRTF, Dr. Bible considered and rejected the possibility that plaintiff meets the criteria for Listed Impairment 12.02 (organic mental disorders), based on plaintiff's learning disability, and mental impairment, or Listed Impairment 12.05 (mental retardation), based on plaintiff's borderline IQ, and opined that a residual functional capacity was necessary.  AR 198, 199, 202.  With respect to the "B" criteria for assessing the severity of a mental impairment, 20 C.F.R. §416.920a, Dr. Bible found that plaintiff had "moderate" restriction of activities of daily living; "mild" difficulties in maintaining social functioning; "moderate" difficulties in maintaining concentration, persistence, or pace; and "no" extended episodes of decompensation.  AR 208.

Pursuant to the MRFC, Dr. Bible found that plaintiff was "not significantly limited" in most mental work-related activities but found that she was "moderately limited" in the following

abilities: "to understand and remember detailed instructions," "to carry out detailed instructions," "to maintain attention and concentration for extended periods," "to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods," and "to respond appropriately to changes in the work setting." AR 191-192.

D. DISABILITY HEARING

On January 20, 2004, plaintiff was heard by the Commissioner's Disability Hearing Officer, who issued his decision denying benefits on February 11, 2004. *See supra*. The hearing officer's summary of plaintiff's testimony and that of her grandmother was later relied on by the ALJ. *See* AR 23, 24, 25 (citing or referencing Exh. 9 at AR 62-70). Plaintiff does not contest the admission or accuracy of this information; nor does the court discern a basis for objection, and so sets forth this evidence.

1. PLAINTIFF'S TESTIMONY BEFORE HEARING OFFICER

The court provides in full the Disability Hearing Officer's summary of plaintiff's testimony before him:

> Ms. Edmond stated that she can't read or write. She said that she was in school taking classes to learn to read and had to write essays. She couldn't do it. She would forget what the teacher explained. Ms. Edmond said that she had other classes in writing, math and English. Math was "okay" and involved adding, subtracting and counting money. Ms. Edmond stated that she is able to handle money and she pays her own cell phone bill with cash. She goes shopping for her personal items and pays the money herself.
>
> Her grandmother helps care for Ms. Edmond's four-year-old child. Ms. Edmond stated that she could bathe and dress the child and take her to school. She is unable to understand the child's school work. When she is sick Ms. Edmond knows how to put the asthma medication in the machine and use the machine. Her grandmother goes with her to the child's doctor appointments and the doctor tells her grandmother the information. Her grandmother does the shopping for food, clothes and toys, but Ms. Edmond said that she could do this. Ms. Edmond said that she doesn't know how to cook, but she could use a microwave oven to make hot dogs. She could not cook bacon and eggs on the stove, so she cooks the bacon in the microwave. Her grandmother does the laundry. Ms. Edmond said that she could dust, vacuum and mop. She tries to wash dishes but her grandmother has to go back over them.

1    Ms. Edmond stopped school at the 10th grade.  She said that she wants to go back
     to school but is afraid to read.  She has looked into Delta College recently and
2    plans to enroll for the next semester.  She wants a job doing office work and is
     willing to put in the effort.  She also would like doing hair.  Ms. Edmond stated
3    that if she had a job she hoped that no one would ask her to read or write.  She
     thinks that she could do a job packing things, like toys into boxes.  She could not
4    do the work at a fast food restaurant.  She could do a job cleaning, vacuuming and
     changing beds as a motel maid.  Ms. Edmond said that interviews would be hard
5    if she were asked questions on paper and had to write.  If asked a question she
     would be embarrassed.  Ms. Edmond worked during a summer youth program at
6    Goodwill Industries.  She was sorting donations and liked the job.  She said that it
     wasn't hard and she worked two hours a day, three days a week.  She couldn't do
7    the job full time because it was dirty and dusty and she had allergies.

8    AR 64.

9                   2.  TESTIMONY OF PLAINTIFF's GRANDMOTHER

10        The court provides in full the Disability Hearing Officer's summary of the testimony of

11   plaintiff's grandmother:

12        Mrs. Thomas testified that Ms. Edmond is unable to work because she can't
          concentrate on three items at a time.  She forgets when she is told something right
13        away.  Ms. Edmond is very embarrassed and needed one-one-on[e] instruction at
          school.  She did not complete high school because she did not have enough
14        credits and couldn't keep up.  Reading was most difficult for her.

15        Ms Edmond won't go out and socialize and she thinks that people make fun of her
          and call her names.  It is difficult for her to make a meal and she must show her
16        which seasonings to use and to wash the meat.  Mrs. Thomas said that Ms.
          Edmond makes her bed but she must tell her to wash the clothes and show her
17        how to sort the clothes, how to use soap and bleach each time.  She must help her
          cook by watching her.  Ms. Edmond can use the microwave.  She takes care of
18        Ms. Edmond's child and shows her how to dress the child and shop for clothes.

19        Accordingly to Mrs. Thomas, Ms. Edmond is not good at handling money.  If she
          has $100 Mrs. Thomas must watch so that she is not short-changed.  Mrs. Thomas
20        stated that Ms. Edmond is not able to shop.  She mostly takes care of Ms.
          Edmond's child and gives her the asthma machine. She wants Ms. Edmond to
21        learn to be responsible and on her own.  She encourages her to go to Delta
          Coll[e]ge.  Mrs. Thomas said that she doesn't think that Ms. Edmond could do a
22        job as a motel maid because she has a temper and gets confused.  She would
          blow-up and walk off the job.  If she had a job packing things she could do it if
23        she did not have to read and were given clear instructions and someone to
          supervise her.

24

25   AR 65.

26   ////

                                          16

1    V.  <u>DISCUSSION</u>

2         A.  <u>LIMITATIONS OF CONCENTRATION, PERSISTENCE AND PACE</u>

3         Plaintiff contends that substantial evidence does not support the ALJ's finding that

4    plaintiff has only slight, rather than moderate, limitations of concentration, persistence and pace.

5    Plaintiff asserts that the ALJ failed to articulate any reasons for discrediting the opinions of those

6    medical experts who found that plaintiff has moderate limitations in concentration, including the

7    State Agency physicians, and plaintiff's teacher in 2002,[12] and that the ALJ failed even to note

8    that there are inconsistencies of record, despite the requirement of Social Security Ruling 96-8p

9    that "[t]he adjudicator must [] explain how any material inconsistencies or ambiguities in the

10   evidence in the case record were considered and resolved."

11        In particular, plaintiff relies on the fact that both State Agency physicians found in their

12   completed PRTFs that plaintiff has "moderate difficulties" in maintaining concentration,

13   persistence and pace.  AR 175 (Dr. Agcaoili), 208 (Dr. Bible).  In addition, Dr. Bible stated in

14   her completed MRFC that plaintiff is "moderately limited" in three mental functions associated

15   with maintaining concentration and persistence ( the abilities to "carry out detailed instructions,"

16   "maintain attention and concentration for extended periods," and "complete a normal workweek

17   without interruptions from psychologically based symptoms"), AR 191-192, while Dr. Agcaoili

18   found in her completed MRFC that plaintiff is "moderately limited" in her ability to "carry out

19   detailed instructions," AR 159.

20        The Commissioner responds that plaintiff fails to distinguish between findings at steps

21   two and three, as compared to steps four and five, of the sequential analysis.  *See* n. 3, *supra.*

22   _____

23        [12]  Plaintiff directs the court's attention to the 2002 report of plaintiff's teacher which
     provides that plaintiff had "a serious problem" with focusing long enough to finish assigned
24   tasks, refocusing to task, carrying out multi-step instructions, completing class or home
     assignments, completing work accurately without careless mistakes, and working at a reasonable
25   pace or finishing on-time.  AR 81.  This evidence of plaintiff's limitations before she reached
     age 18 provides historical perspective but is not relevant to ascertaining her current residual
26   functional capacity.

The Commissioner asserts correctly that the findings at steps four and five require a more detailed analysis than that required at steps two and three, and that the findings set forth on a PRTF apply to the analysis at steps one through four, while the findings on a MRFC apply to the residual functional capacity assessment at steps four and five. *See* Social Security Ruling 96-8p,[13] and *Maier v. Commissioner of Social Security*, 154 F.3d 913 (9th Cir. 1998);[14] *see also Hoopai v. Astrue*, 499 F.3d 1071, 1076 (9th Cir. 2007) (severity of limitations at step five must be greater than the severity of impairments at step two, "otherwise the two steps would collapse and a vocational expert would be required in every case in which a step-two determination of severity is made").[15]

The Commissioner's argument is well taken with respect to the State Agency physicians' findings of moderate limitations in their respective PRTFs – those findings do not translate into global moderate limitations in assessing residual functional capacity. Moreover, close examination of these consultants' findings in their MRFCs demonstrates that the moderate

[13] "The psychiatric review technique described in 20 CFR 404.1520a and 416.920a and summarized on the Psychiatric Review Technique Form (PRTF) requires adjudicators to assess an individual's limitations and restrictions from a mental impairment(s) in categories identified in the "paragraph B" and "paragraph C" criteria of the adult mental disorders listings. [These limitations] . . . are not an RFC assessment but are used to rate the severity of mental impairment(s) at steps 2 and 3 of the sequential evaluation process. The mental RFC assessment used at steps 4 and 5 of the sequential evaluation process requires a more detailed assessment by itemizing various functions contained in the broad categories found in paragraphs B and C . . ." Social Security Ruling 96-8p, at p. 4.

[14] "The Psychiatric Review Technique form used by the ALJ 'outlines the steps' of the procedure in accordance with 20 C.F.R. § 416.920a(d) and is appropriate for use regardless of the evaluation outcome. The Mental Residual Functional Capacity Assessment form . . . is completed at the conclusion of a residual functional assessment, the steps of which are not even detailed in 20 C.F.R. § 416.920a. Rather, the steps of the residual functional assessment procedure are described in 20 C.F.R. § 416.945. . . . the Mental Residual Functional Capacity Assessment form does not encompass any of the criteria involved in steps one through four of the sequential evaluation process. The Psychiatric Review Technique form does." *Maier*, 154 F.3d at 915.

[15] The Commissioner also directs the court to a decision rendered by U.S. Magistrate Judge Dennis L. Beck, also of the Eastern District, in which he relied on *Hoopai* to conclude that "moderate limitations at steps two and three do not necessarily translate into a disabled RFC." *McArthur v. Astrue* (Civ. No. F-07-0805 DLB Mar. 26, 2008), slip op. at 12.

limitations they found relate only to functions associated with following *detailed* instructions and maintaining concentration for *extended* periods. Dr. Bible's additional finding that plaintiff has moderate limitations in her ability to "complete a normal workweek without interruptions from psychologically based symptoms," AR 192, is self-evident and not an inherently decisive factor, particularly in light of Dr. Bible's additional findings that plaintiff is "not significantly limited" in the following abilities: "carry out very short and simple instructions," "perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances," "sustain an ordinary routine without special supervision," "work in coordination with or proximity to others without being distracted by them," and "make simple work-related decisions." AR 191. These findings are consistent with Dr. Agcaoili's conclusion that plaintiff "is capable of performing simple, repetitive tasks." AR 161. The ALJ gave "substantial weight" to the conclusions of Dr. Agcaoili, AR 22, and "appropriate weight" to the conclusions of Dr. Bible, AR 23, consistent with his own findings.

The ALJ's findings are further supported by the reports of the examining physicians. While State Agency consultants are highly qualified experts whose findings must be considered, 20 C.F.R. § 416.927(f)(2)(i), Social Security Ruling 96-6p, their opinions are outweighed by the supported opinions of examining professionals, *Lester*, 81 F.3d at 831. The reports of examiners Mattesich-Wakefield, Daigle and Kalman, provide substantial evidence in support of the ALJ's finding that plaintiff's limitations of concentration, persistence and pace do not preclude her from performing simple repetitive tasks. Specifically, as noted by the ALJ, Drs. Mattesich and Wakefield found that plaintiff has "the ability to maintain concentration." AR 21, *see* AR 154 (noting that plaintiff, during testing, "exhibited an adequate degree of task persistency, and was able to maintain her concentration"). The ALJ gave "appropriate weight" to these findings. AR 21. The ALJ also gave "appropriate weight" to the finding of Dr. Daigle that plaintiff is only "[s]lightly limited in ability to maintain concentration and attention, persistence and pace." AR 22; *see also* AR 189. Additionally, while the ALJ gave "reduced weight" to the opinion of Dr.

Kalman, AR 24, this examiner found that plaintiff has the "ability to maintain attention and concentration for extended periods (the approximately 2-hour segments between arrival and first break, lunch, second break, and departure) with four such periods in a workday," AR 264, and is only "mildly limited" in her ability to "understand and remember very short and simple (one- or two-step) repetitive instructions or tasks," AR 263.

The ALJ properly set forth the findings of each medical examiner, the weight he accorded these findings, and the reasons for his conclusions.

Finally, as noted by the ALJ, AR 23, plaintiff's testimony before the Disability Hearing Officer is inherently persuasive in concluding that plaintiff can maintain adequate concentration, persistence and pace to engage in substantial gainful activity. Not only was plaintiff considering further education, but she stated that she "wants a job doing office work and is willing to put in the effort;" that she would also like "doing hair;" that she liked working at Goodwill Industries; that she believed "she could do a job packing things, like toys into boxes;" and "do a job cleaning, vacuuming and changing beds as a motel maid." AR 64. Even plaintiff's grandmother conceded that plaintiff could perform "a job packing things . . . if she did not have to read and were given clear instructions and someone to supervise her." AR 65.

B. LISTING 12.05C

Plaintiff contends that the ALJ erred in finding that plaintiff's mental impairment does not meet or equal the criteria for Listing 12.05C (Mental Retardation).

The Social Security Regulations' "Listing of Impairments" sets forth impairments and combinations of impairments that are so severe as to be considered presumptively disabling, without further consideration of a claimant's residual functional capacity, past relevant work, or other jobs. 20 C.F.R. §§ 404.1520(d), 416.920(d); *Young v. Sullivan*, 911 F.2d 180, 183 (9th Cir. 1990). In order for a claimant's impairment(s) to meet or equal a listed impairment, all of the requirements of that listing must be met. *Key v. Heckler*, 754 F.2d 1545, 1550 (9th Cir. 1985).

////

Listing 12.05, 20 C.F.R., Appendix 1, Part 404, Subpart P, Regulations No. 4, sets forth the criteria for finding a claimant presumptively disabled based on mental retardation or autism.[16] To support a finding of disability under Listing 12.05C, the claimant must demonstrate "significantly subaverage general intellectual functioning with deficits in adaptive behavior initially manifested during the developmental period (before the age 22)," a "valid verbal, performance, or full scale IQ of 60 through 70, and a physical or other mental impairment imposing an additional and significant work-related limitation of function."

////

---

[16] Listing 12.05 provides in pertinent part:

Listing 12.05: Mental retardation refers to a significantly subaverage general intellectual functioning with deficits in adaptive behavior initially manifested during the developmental period (before age 22). (Note: The scores specified below refer to those obtained on the WAIS, and are used only for reference purposes. Scores obtained on other standardized and individually administered tests are acceptable, but the numerical values obtained must indicate a similar level of intellectual functioning.) . . .

The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied.

A. Mental incapacity evidenced by dependence upon others for personal needs (e.g., toileting, eating, dressing, or bathing) and inability to follow directions, such that the use of standardized measures of intellectual functioning is precluded;      Or

B.  A valid verbal, performance, or full scale IQ of 59 or less; Or

C.  A valid verbal, performance, or full scale IQ of 60 through 70, and a physical or other mental impairment imposing an additional and significant work-related limitation of function; Or

D.  A valid verbal, performance, or full scale IQ of 60 through 70, resulting in at least two of the following:

     1. Marked restriction of activities of daily living; or
     2. Marked difficulties in maintaining social functioning; or
     3. Marked difficulties in maintaining concentration, persistence, or pace; or
     4. Repeated episodes of decompensation, each of extended duration.

Plaintiff asserts that the ALJ failed to give sufficient weight to the Mattesich-Wakefield finding that plaintiff scored 67 on the Full-scale WAIS-III (thus meeting the threshold objective requirement of Listing 12.05C), and did not reconcile his reliance on the examiners' conclusion that these test results underestimate plaintiff's true capacities yet plaintiff appeared to put forth her best effort during testing. This argument fails for two reasons. First, the examiners, both psychologists, satisfactorily addressed this facial inconsistency based on plaintiff's mature presentation and interaction.[17] Second, as required by Listing 12.05C, the ALJ considered whether plaintiff's impairments "impos[e] additional and significant work-related limitation of function." Listing 12.05C. Based on substantial evidence of record, the ALJ found that plaintiff has "substantial activities of daily living" that are transferable to the work setting. He accurately summarized these activities as follows: "She is able to care for two small children as well as work as an in-home care provider. She can cook, clean, shop, and take public transportation." AR 20; *see also* the supported findings at AR 23, 25. Plaintiff's supporting testimony before the Disability Hearing Officer has already been noted.

Plaintiff's contention that the Commissioner's prior finding of disability based on "mental retardation" should ensure a continued finding of disability on the same basis is contrary to the requirement and purpose of the federal statute requiring that disabled children be reevaluated when they reach the age of 18. 42 U.S.C. § 1614(a)(3)(H).

Accordingly, the court finds that substantial evidence supports the ALJ's finding that plaintiff's impairments do not meet the criteria for Listing 12.05.

////

---

[17] The examiners noted: "She presented as being higher functioning than what her performance on standardized tests would reflect. Her vocabulary was less than average, but she exhibited an adequate functional usage of language. She had no difficulty comprehending this examiner's questions or formulating verbal responses. Specific deficits in speech articulation were not evident, and this examiner had no difficulty understanding her spoken language. She exhibited an adequate degree of task persistency, and was able to maintain her concentration. While she appeared to put forth her best effort results form standardized tests were viewed as providing an under-estimation of her capabilities." AR 154.

C. OPINION OF PLAINTIFF'S CONSULTATIVE PSYCHIATRIST

Plaintiff contends that the ALJ improperly rejected the opinion of plaintiff's consultative psychiatrist, Dr. Les Kalman.

A contradicted opinion of an examining physician may be rejected only for "specific and legitimate" reasons supported by substantial evidence. *Lester*, 81 F.3d at 830.

As earlier noted, the ALJ gave "reduced weight" to Dr. Kalman's findings primarily because they were inconsistent with other substantial evidence of record. The ALJ reasoned:

> While [Dr. Kalman] noted [plaintiff] is unable to read and write, she is able to read to her daughter, and can read at a third grade level. The statement that the claimant's math skills are at a first grade level are contradicted by the report from the claimant's teacher, who indicated that she was at a fifth grade level in math, as well as the claimant's statement to the disability hearing officer that her ability to perform math is "okay," and that she can add, subtract and count money (Exhibit 9). The claimant's statement that she does not know the names of any presidents is contradicted by an earlier statement to an evaluating physician that the current president's name is Washington, indicated that she does in fact know the name of at least one president. Other contradictions include her statements that she does not cook or clean the house, and does not have any friends. Finally, Dr. Kalman's opinions regarding the claimant's ability to work and interact with others, complete a workday, or ask simple questions are contradicted by the claimant's demonstrated ability to work which she has done since 2003.

AR 24.

With exception to the ALJ's curious reliance on the plaintiff's reference to the current president's name [as] Washington,"[18] these are specific and legitimate reasons, supported by substantial evidence of record, for discrediting the conclusions of Dr. Kalman. Additionally, the Commissioner need not give any weight to a conclusory opinion supported by minimal clinical

---

[18]  The ALJ's reference to the plaintiff's mention of "Washington" as somehow undermining Dr. Kalman's report is puzzling. It adds nothing in support for that finding. The report shows that the "[c]laimant stated the current president was "Washington, no, I don't know.' She could not correctly name three large California cities." Contrary to the ALJ's treatment of the responses, they support Dr. Kalman's assessment of the plaintiff's mental functioning. While there are legitimate reasons the ALJ could have relied on to favor other opinions over that expressed by Dr. Kalman, this is not one of them.

findings. *Meanel v. Apfel*, 172 F.3d 1111, 1113 (9th Cir. 1999) (rejecting treating physician's conclusory, minimally supported, opinion); *see also Magallanes,* 881 F.2d at 751. Nor is a physician's opinion reliable if based upon subjective complaints that are discredited. *Sandgathe v. Chater,* 108 F.3d 978, 980 (1997). Significantly, plaintiff does not challenge the ALJ's assessment discrediting significant aspects of her testimony.

Accordingly, the court finds that the ALJ properly discredited Dr. Kalman's opinion.

VI. CONCLUSION

Consistent with this analysis and the evidence of record, the ALJ submitted to the vocational expert hypothetical questions setting forth plaintiff's supported limitations, and obtained the expert's testimony that plaintiff can perform representative occupations such as "hand presser," "mail sorter," and "cleaner." AR 26, 328. Accordingly, the ALJ properly found that plaintiff is not disabled within the meaning of the Social Security Act.

For the foregoing reasons, IT IS HEREBY ORDERED that:

1. Plaintiff's motion for summary judgment, Dckt. No. 19, is denied;

2. The Commissioner's cross-motion for summary judgment, Dckt. No. 21, is granted; and,

3. The Clerk is directed to enter judgment for the Commissioner.

SO ORDERED.

Dated: March 30, 2009.

EDMUND F. BRENNAN
UNITED STATES MAGISTRATE JUDGE